[No. 10,072.]

## THE PEOPLE v. WINCHESTER DOYELL.

TERMS OF COUNTY COURTS.—The Code of Civil Procedure only purports to deal with the times when the terms of the County Court should be commenced after it went into operation, on the first day of January, 1873.

EFFECT OF CODE OF CIVIL PROCEDURE ON TERMS OF COURTS.—The fact that the Code of Civil Procedure, approved March 11th, 1872, fixed the time when the terms of a County Court should commence, and repealed a prior statute also fixing the times of their commencement, did not suspend the business of the Court prior to the first day of January, 1873, nor affect the general law which required a term to be continued until the business of the Court was disposed of; nor did it, when it went into effect, put an end to a term then in progress, commenced on the second Monday in December, 1872.

IDEM.—The effect of the repealing clause on the prior statute fixing the terms was, to declare that the terms should not thereafter begin on the days mentioned by virtue of any authority derived from the statute repealed.

INDICTMENT—WHEN MAY BE FOUND.—A Grand Jury in Sierra County, convened at a term of the County Court, commencing on the second Monday in December, 1872, had jurisdiction to find an indictment after the Code of Civil Procedure went into effect, January 1, 1873.

JUROR MAY BE WITNESS.—A juror is not disqualified from becoming a witness in a proper case, but public policy prohibits him from impeaching his own verdict by an affidavit, that a juror made statements in the jury room, of matters not in evidence.

IMPEACHMENT OF WITNESS.—When an attempt is made to impeach a witness, by proving former statements made by him in conflict with what he has stated before the Court, his credit cannot be sustained by proof that he made to other persons, before being called as a witness, the same statement detailed in his testimony.

IDEM.—Such statements made by the witness may, however, be admissible in contradiction of evidence tending to show that the statement made by him under oath is a fabrication of a late date, if the statements were made before their effect could be foreseen; and, perhaps, in other peculiar cases.

STATEMENT OF TESTIMONY, IN CHARGE OF JUDGE.—If the Judge, in his charge to the jury in a criminal case, undertakes to state a portion of the testimony, the safer way is to recite the language of the witness as taken down by the Reporter, or in the Judge's notes; but when the language of the District Judge is in substance and effect a repetition of the testimony, the defendant cannot complain.

INSTRUCTIONS TO A JURY.—All the charge of a Court to the jury must be taken together, and if it harmonizes as a whole, and correctly presents the law, a new trial will not be granted because a separate instruction does not contain all the conditions which are to be gathered from the entire text.

MURDER IN THE SECOND DEGREE.—A homicide which is unlawful, and accompanied with malice, but not deliberate and premeditated, is murder in the second degree.

APPEAL from the District Court, Tenth Judicial District, County of Sierra.

The defendant was indicted for the crime of murder, in the killing of Alexander Black, on the 2d day of November, 1872. The indictment was found by the Grand Jury on the 19th day of March, 1873. The term of the County Court at which it was found, commenced on the second Monday in December, 1872.

The Code of Civil Procedure was approved on the 11th day of March, 1872, and went into effect on the 1st day of January, 1873. When the cause was called for trial, the counsel for the defendant moved to dismiss the indictment, on the ground that it was found at a time when no term or session of the County Court was authorized by law to be held. The Court overruled the motion. After a verdict of guilty of murder in the second degree, the defendant's counsel moved the Court to arrest the judgment for the same reason. The Court denied the motion. The defendant moved for a new trial, and in support thereof, filed the affidavit of Frank Johnson, one of the jurors, stating, that while the jury were deliberating, defendant's character was

being discussed, and that H. R. Perry, one of the jurors, stated that defendant was, to his knowledge, a quarrelsome man, and that he was at one time on a drunk at Downieville, and had his arms taken away from him. The affidavit also stated that W. E. Corbett, another of the jurors, left the jury-room through a window, and remained absent eight or ten minutes unattended by the sheriff, and that the jury had with them the Penal Code, and read portions thereof relating to murder in the first and second degrees, and to manslaughter. The prosecution filed affidavits of Thomas Steel, a juror, and said Corbett, contradicting Johnson as to Corbett having left the jury-room.

The homicide was committed in Sierra County, about twelve miles from Downieville. Defendant claimed a tract of land under the Possessory Act of 1852. Black, several days before he was killed, employed one Andrews to cut some firewood for him on the land claimed by the defendant. After the wood had been cut, the defendant claimed it as his property, and loaded it on a wagon, and was hauling it away, when he was met by the deceased, and one Andrews, who stepped before the team and stopped it. The deceased ordered the defendant to unload the wood, and at the same time asserted his ownership of it. A controversy about the wood followed—the parties retaining their respective positions—but no violent language was used until a son of the defendant, about eight years of age, standing near, said that the wood belonged to his father. The defendant told the boy to dry up, but he repeated his assertion, when the deceased told him he did not want to talk to boys. Thereupon the defendant sprang at the deceased, who was standing still, and struck him with his axe, saying at the same time, "d——n you, you shall not insult or abuse my boy." The first blow was caught by the deceased, but the defendant disengaged the axe, and then struck a fatal blow.

On the trial, one Burrows, who was present at the killing, testified on behalf of the defendant, that he saw the deceased, a few minutes before the attack, put his hand to his pocket, and partly or wholly draw a pistol, and then replace it. On cross-examination the witness was asked if,

on the day of the killing, he had not stated to Byington and Cochran that he did not see any weapon in the hands of the deceased at the time of the difficulty? He answered that he had no recollection of having made such a statement. The counsel for the defendant, to support the credibility of Burrows, then offered to prove that Burrows had, on the day of the killing, told other persons than Byington and Cochran, that he saw the pistol. The testimony was excluded by the Court. Byington was called by the prosecution, and testified that Burrows told him, on the day Black was killed, that he saw no weapon on the deceased. The defendant was convicted of murder in the second degree, and appealed from the judgment, and from an order denying a new trial.

*P. Vanclief* and *G. G. Clough*, for the Appellant, argued that the Court erred in fixing the order of argument without any reason therefor, and cited the Penal Code, sections one thousand and ninety-three and one thousand and ninety-four; and that it was error to allow a juror to give evidence of the bad character of the defendant in the jury-room, and cited Penal Code, sections one thousand one hundred and twenty and one thousand one hundred and eighty-one; and also that it was error for the jury to read and construe the law in the jury-room, and cited Penal Code, section one hundred and thirty-seven; and *Hardy* v. *State,* 7 Mo. 607. They also argued that it had been decided in this State that a juror could not impeach his own verdict, only as a rule of common law, and that there was no room for its application under the Codes. They also argued that the declarations made by the juror Perry, in the jury-room, were made by him as a witness, because he was acting under oath, and cited Code of Civil Procedure, sections one thousand eight hundred and seventy-eight and one thousand eight hundred and seventy-nine, and that said sections were repugnant to the common law, excluding a juror from being a witness ; and, therefore, his statements in the jury-room were evidence before the jury, and should not have been received. They argued

further, that the Court erred in refusing to permit evidence of Burrows' former statements in support of the one made by him as a witness; and cited 2 Phillips' Ev. (4th Am. ed.) Cow. & Hill's Ev. 600, note; *Cooke v. Curtis*, 6 Harris and John, (Md.) 93; 2 Wash. C. C. Rep. 148; *State v. Twitty*, 2 Hawks, 448; *Packer's Lessees v. Gonsalus*, 1 S. & R, 536; *Henderson v. Jones*, 10 Sergt. & R. 322; *Coffin v. Anderson*, 4 Blackf. 395; *Beauchamp v. State*, 6 Blackf. 299; *Wright v. Deklyne*, 1 Pet. C. Ct. 199; *State v. George*, 8 Ired. 324; *State v. Dove*, 10 Ired. 469; *March v. Harrell*, 1 Jones, 329; *State v. DeWolf*, 8 Conn. 93; *People v. Vane*, 8 Wend. 78; *People v. Moore*, 15 Wend. 419; *Clapp v. Wilson*, 5 Den. 286; *Robb v. Hankley*, 23 Wend. 50.

They also argued that the Court erred in instructing the jury that if the killing was unlawful, accompanied with malice, but not deliberate and premeditated, it was murder in the second degree; that murder in the second degree was not defined by our statute, except that it was the residuum of murder at common law, after subtracting therefrom what was defined to be murder in the first degree; but that murder at common law was never less than the killing of a human being with malice aforethought, or malice prepense; and, therefore, to constitute murder in the second degree, the killing must be with the malice prepense of the common law; and unless the word malice, as used in the instructions, might be understood to mean the same as the common law malice prepense, the instructions were erroneous; but they could be so understood, if malice prepense implied either deliberation or premeditation.

*John L. Love, Attorney-General*, for the Respondent, in relation to the order of argument by counsel, cited *People v. Fair*, 43 Cal. 137, and argued that Burrows' statements made before he was a witness, in support of his testimony, could not be received for the purpose of sustaining his character as a witness.

By the Court, McKINSTRY, J.:

1. On the 19th day of March, 1873, the defendant was indicted for the murder of Alexander Black.

The Grand Jury by whom the indictment was presented, was impaneled at the term of the County Court of Sierra County, which began on the second Monday of December, 1872. By the law then in operation (Stats. 1864, p. 41), there were held in the County of Sierra four terms of the County Court in each year, commencing on the third Monday of April, June and September, and second Monday of December. The Code of Civil Procedure, which went into operation on the 1st day of January, 1873, provided that the terms of the County Court of Sierra must be held on the same days as were named in the statute of 1864, and repealed that statute. But this Code did not suspend all the business of the Court, nor put an end to the term then in progress. The Code of Civil Procedure (Section 88), only purports to deal with the times when the terms should be commenced, after the Code went into operation. The effect of the repealing clause on the prior statute, fixing the terms, was to declare that the terms should not thereafter begin on the days mentioned, by virtue of any authority derived from the statute repealed. But the general law which requires a term to be continued until all the business of a Court is disposed of, was not affected by the repeal.

The Grand Jury, therefore, had jurisdiction to find and present this indictment.

2. A juror is not disqualified to become a witness in a proper case. But public policy prohibits a juryman from impeaching his own verdict by affidavit.

3. There are cases which sustain the proposition of defendant's counsel, that when an attempt is made to impeach a witness by proving former contradictory statements, he may be supported by evidence that he has made to other persons, declarations consistent with his testimony. Such is the law of Indiana, and perhaps of Pennsylvania and North Carolina. In New York, as in England, after much uncertainty, the rule seems now to be settled that such evidence is ordinarily inadmissible; and in others of the States it is rejected. The best elementary writers reach the conclusion that the evidence is to be received only in exceptional cases. The witness cannot be confirmed by

proof that he has given the same account before, for his mere declaration is not evidence. His having given a different account, although not upon oath, necessarily impeaches either his veracity or his memory; but his having asserted the same thing does not in general carry his credibility further than, nor so far as, his oath.

Such declarations may, however, be admissible in contradiction of evidence tending to show that the account is a fabrication of late date, where it may be shown that the same account was given before its ultimate effect and operation (arising from a change of circumstances,) could have been foreseen; and also, perhaps, in other peculiar cases. (1 Wharton Am. Cr. L. 820; 2 Phillipp's Ev. C. and H. notes, 5 Am. Ed. Star. p. 915; Roscoe's Cr. Ev. 97; 1 Greenl. Ev. 469; Starkie's Ev. 253.) In the present case the record does not suggest that the witness occupied any peculiar relation to the defendant or the deceased, or to any matter arising on the trial or transpiring in the evidence, which should constitute a reason for a departure from the general rule.

The objections to the questions, of the character here referred to, were properly sustained.

4. In his charge, the District Judge stated a portion of the testimony of the defendant, not repeating his exact words, but giving their substance.

The safer way is to recite the language of the witness, as taken down by the reporter, or in the Judge's notes. But when—in the opinion of this Court—the statement of the District Judge is, in substance and effect, a repetition of the testimony, we are not authorized to grant a new trial for an inadvertence which could not have influenced the action of the jury improperly.

5. The defendant claimed to be the owner of the wood (the subject of the dispute which preceded the killing), because the same was cut by the deceased from land of which the defendant was in the constructive possession, under the Act of the Legislature known as the "Possessory Act."

As the wood was in the actual possession of the defendant at the time of the killing, he was, *prima facie*, the owner

of it; and the evidence of the location of the land claimed by him, tended to show his actual ownership (as against the fact that it was cut by deceased,) and his good faith in defending his possession. The evidence as to the location of the eastern line of the defendant's claim, and as to the monuments designating it, was conflicting. The Court below informed the jury that the evidence as to the lines of defendant's claim was admitted for the purpose of showing his good faith, and that it was unnecessary for them to fix the location of the east line; or, in order to arrive at a verdict, to determine whether the defendant had complied with the conditions of the Act of the Legislature, so as to entitle him to be deemed in possession of the land. In effect, the charge was that if the defendant was in the actual possession of the wood, and believed, as a reasonable man, that he was the owner of it, he had the same right to protect his possession as if, in law and fact, he was the owner. Particular expressions may be subject to criticism, but the instruction given would seem to be as favorable to the defendant as he could demand.

6. Counsel for defendant requested the Court to charge: "If, under the instructions given you, you shall find that the wood in dispute between the defendant and the deceased, at the time of the killing, was the property of defendant, then the defendant was not required by law to deliver or give up the possession of said wood to Black, the deceased, in order to prevent such personal conflict as might be necessary to defend his possession; but on the contrary, the defendant had a right to defend his possession of said wood against any forcible attempt of Black to take it from him; and, if necessary for that purpose, had a right to kill Black; for the owner of personal property in his possession has a right to use such force as is necessary to prevent the forcible taking of it from his possession by one not entitled to the possession of it."

The Court gave the instruction as asked, with the addition following: "If, however, the alleged trespass is unaccompanied by any felonious attempt, the law does not admit the force of the provocation to be sufficient to warrant

the owner to make use, in repelling the trespass, of a deadly weapon; and if, under such circumstances, the owner of the property, with a deadly weapon, slays the trespasser, the owner is guilty of murder."

The defendant excepts to that portion of the instruction added by the Court, on the ground that it declares that nothing short of an attempt to commit a felony can be admitted as a sufficient provocation to reduce the homicide below murder.

The instruction, as originally drawn, assumed the hypothesis that the defendant was acting in self-defense, with full possession of his faculties and control of his temper. It was addressed to the question of justification, and not to the great provocation and irresistible passion which enter into the definition of manslaughter. The proviso, added by the Court, treated of the same subject, and simply announced that, in a certain event, the defendant would still be guilty of murder, notwithstanding the general proposition contained in the instruction as prepared by counsel. In another part of the charge the Court explained the law of manslaughter, and the difference between that crime and murder. The instruction excepted to is to be read as if it contained a clause, "if the defendant was not carried away by irresistible passion," etc. Such is the meaning which was conveyed to the jury; such its fair and reasonable construction, because, thus construed, it accords with what is elsewhere said in the charge with respect to manslaughter.

We must take the charge together, and if without straining any portion of the language, it harmonizes as a whole, and fairly and correctly presents the law bearing on the issues tried, we will not disturb the judgment because a separate instruction does not contain all the conditions and limitations which are to be gathered from the entire text.

It is true that an error which might affect the defendant will be presumed to have injured him; but another presumption is, that jurors are men of common intelligence, and capable of comprehending the ordinary use of lan-

guage, as applied to the particular proposition under consideration, and in reference to which it is employed. We will not assume that the jurymen may not have understood the charge as we understand it.

7. The Court charged the jury, among other things, "If you believe from the evidence that the killing was unlawful, accompanied with malice, but not deliberate and premeditated, your verdict will be murder in the second degree." This is assigned as error.

Murder is the unlawful killing of a human being with malice aforethought.

The malice aforethought may be expressly shown by the proof of facts affirmatively establishing the killing to have been the result of a formed intention to take life.

To establish the malice aforethought, however, the specific intent to kill need not be proved. To constitute a crime, there must be a joint operation of act and intention. But the common law measures an act which is *malum in se*, substantially by the result produced, though not contemplated, holding the doer of the act guilty of the thing done in the same manner as if it were specially intended, though not always guilty of the crime committed in the same degree. (*People* v. *Foren*, 25 Cal. 365.) Whenever one, in doing an act with the design of committing a felony, takes the life of another, even accidentally, this is murder. (Acts of 1850, p. 220, Sec. 25; 2 Bish. Cr. L. 741.) In such homicides the law superadds the intent to kill to the original felonious intent, and estops the criminal from denying the further intent thus imputed. The thing done having proceeded from a corrupt mind, is to be viewed the same, whether the corruption is of one particular form or another. (Ruth. Inst., Ch. 18, Sec. 9; 1 Bish. Cr. L. 411.)

The amendment (of 1856) of the Act of 1850, "concerning crimes and punishments," did not change the law of murder, done in the attempt to commit a felony. It only prescribes a severer punishment where the murder is committed in the attempt to perpetrate arson, rape, robbery or burglary (on account of the enormity of these offenses), than

where it is committed in carrying out any other felonious design.

Murder of the first degree .(aside from that committed in the perpetration or attempt to perpetrate the felonies enumerated) is any kind of unlawful, willful, deliberate and premeditated killing; all other kinds of murder are of the second degree. (Act "concerning crimes," etc., Sec. 21, as amended April 19, 1856.) Unless, therefore, there can be an unlawful killing, "with malice aforethought," which is not, within the meaning of the twenty-first section, willful, deliberate and premeditated, the statute has failed, fully and intelligibly, to separate the two degrees of the crime.

The malice aforethought, which is an ingredient of murder, is express or implied.

Express malice is that deliberate intention to take away the life of a fellow-creature which is manifested by external circumstances capable of proof. Murder of the first degree is where the circumstances prove, beyond a reasonable doubt, the intent to kill; it is a willful, deliberate and premeditated killing. (*People* v. *Bealoba,* 17 Cal. 389.) If the intent to take life is proven, there need be no appreciable space of time between the intention to kill and the act of killing. (*People* v. *Sanchez,* 24 Cal. 30.)

There is no room for the consideration of implied malice, if express malice—the deliberate intention to take life—is made manifest by the evidence.

But, beside those committed in the perpetration of felonies, a large number of homicides have been adjudged murder, where the specific intent to take life does not appear or does not exist. Thus, where the killing is involuntary, but happens in the commission of an unlawful act, which, in its consequences, naturally tends to destroy life, it is murder; so, if the intent to kill is not made apparent, but the killing is unlawful, and not done in the heat of passion, or the specific intent to take life not appearing, all the circumstances show an abandoned and malignant heart. In these, and in like cases, the malice aforethought is implied, the law attributing to the slayer the intent to kill, although such intent is not made manifest as a fact.

On the other hand, the law, in some cases of voluntary manslaughter, disregards the actual intent to kill, when the killing is done in a sudden passion, caused by sufficient provocation.

In the former cases the slayer is presumed to be actuated by an intent which may not exist; in the latter (out of forbearance for the weakness of human nature) the slayer is presumed not to be actuated by an intent to kill, although such intent may in fact exist.

Thus the presence or absence of "malice aforethought" has come to be determined oftentimes by artificial or technical reasoning, and not always by a simple reference to the actual intent to kill, as made manifest by the circumstances proved in each case. And the crime is equally murder where the malice aforethought is expressly proved and where it is implied—as from the killing in the absence of considerable provocation, or from such wanton recklessness, on the part of the slayer, as shows an abandoned and malignant heart.

The amendment of 1856 did not change the law of murder. (*People* v. *Haun*, 44 Cal. 96.) But, besides its effect on homicides committed in the attempt to perpetrate certain felonies, it prescribes a more severe punishment for those murders in which the express intent to take life is affirmatively proved, than for those in which the express malice not being proved, the malice aforethought is implied.

If the unlawful killing is done without the provocation and sudden passion which reduces the offense to manslaughter, or is done in the commission of an unlawful act, the natural consequences of which are dangerous to life, or is committed in the attempt to perpetrate a felony other than those mentioned in the description of murder in the first degree, or the circumstances of the killing show an abandoned and malignant heart, this is murder in the second degree, unless the facts prove the existence in the mind of the slayer of the specific intent to take life. Malice aforethought is implied from the absence of considerable provocation, the wanton recklessness, or the felonious purpose; but the express malice—the deliberate intent to take life—

is not manifested by the facts. (*People* v. *Bealoba,* 17 Cal.
389; *People* v. *Sanchez,* 24 Cal. 17; *People* v. *Foren,* 25 Cal.
361; 1 East's P. C. 255; Wharton's Am. Cr. L. 420; 1
Browne's appendix, 22; 1 Ashm. 298–9.) The language em-
ployed in the *People* v. *Long* (39 Cal. 694), is to be taken in
a sense which accords with what is said above. If it is there
intimated that in murder of the second degree there may
be an intention to take life, this is to be considered as re-
ferring to the intent which the law imputes by reason of the
corrupt motive of the slayer, or otherwise, and not to an
actual preconceived design to kill.

We do not think that the charge complained of was erro-
neous.

It is not to be understood from the distinction above
made, based on the difference between express and implied
malice, that a jury are to refuse to draw natural inferences
from the facts in evidence. On the contrary, since the
condition of a defendant's mind can only be ascertained by
his conduct, it is the duty of the jury to weigh all the facts,
including the acts of the defendant before and after the
fatal assault, which are admitted in evidence, the character
of the weapon used, and all other circumstances which
throw light upon his purpose. If the evidence proves the
very intent to take life, the murder is of the first degree.
But the inquiry relates to a real, not a suppositive state of
mind; to an actual intention, not to one merely attributed
to a defendant by a rule of law.

Judgment and order denying the motion for new trial
affirmed.

Mr. Justice Rhodes did not express an opinion.